UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

Case No.: 3:16-CV-2460-AJB-LL

LARRY HERNANDEZ,

Petitioner,

v.

SCOTT KERNAN,

Respondent.

**REPORT AND RECOMMENDATION FOR ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

**[ECF No. 7]**

This Report and Recommendation is submitted to United States District Judge Anthony J. Battaglia pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.

On September 28, 2016, Petitioner Larry Hernandez, a state prisoner proceeding *pro se*, commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254. ECF No. 1 ("Pet."). On October 31, 2016, Petitioner filed a First Amended Petition for Writ of Habeas Corpus. ECF No. 7 ("FAP"). Petitioner challenges his convictions for: (1) sexual battery by restraint; and (2) sexual penetration by foreign object by force, fear or threats. FAP at 2; Lodgment 3-3 at 8-18; Lodgment 7 at 2.[1]

---

[1] Petitioner's jury convictions for: (1) assault with the intent to commit sexual penetration by foreign object by force, fear or threats and (2) first degree burglary were reversed by the California Court of Appeals. Lodgment 7 at 38.

1

On January 4, 2017, Respondent answered the FAP. ECF No. 15. Petitioner did not file a traverse. See Docket. The Court has considered the FAP, Answer, and all supporting documents filed by the Parties.

For the reasons set forth below, the Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Facts Of The Underlying Offense

The following facts are taken from the California Court of Appeal's opinion in People v. Larry Hernandez, 2016 Cal. App. Unpub. LEXIS 1641 (Mar. 4, 2016) [Lodgment 7]. Absent clear and convincing evidence to the contrary, the Court presumes the state court's factual determinations are correct. 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

Prosecution

In January 2013, 57-year-old D., lived alone in an apartment in El Centro. D. had been in a wheelchair for 10 years because of a degenerative muscular disease. On January 12, 2013, around 3:00 a.m., D. was awakened by a loud noise. She got into her wheelchair, activated the burglar alarm, and wheeled herself toward the bedroom door. D. heard the sound of breaking glass coming from her living room. When she went to the front door, she saw that the window was broken. Hernandez was putting his hand through the window and was trying to unlock the door.

D. pushed Hernandez's hand away and attempted to close the door. When Hernandez kept pushing on the door, D. bit one of his right fingers. Nevertheless, Hernandez forced his way in. Hernandez asked D., "Don't you like dick?" D. yelled. Hernandez touched D.'s left breast and vagina over her clothing. He then put his hand inside her underwear and stuck at least one finger in her vagina.

D. tried to push Hernandez away from her. Hernandez hit D., knocking her out of her wheelchair. Hernandez threw D. to the ground and removed her pants. D. crossed her legs. Hernandez

asked, "Aren't you ill?" and tossed her pants aside. Hernandez grabbed a glass candle holder from a nearby table and unsuccessfully attempted to insert it into D.'s anus.

Hernandez stepped outside, returned with a water bottle, rubbed it on D., and inserted the bottle head into D.'s vagina. The bottle cut D. on the interior of her vagina, and she started bleeding. D. cried and yelled for help. Hernandez opened the water bottle and emptied the water onto D.'s body. D. scratched Hernandez on his left cheek. Hernandez then left the apartment. D. rolled over, dragged herself to her wheelchair, wheeled herself to her bedroom, and telephoned her son.

Officers with the El Centro Police Department were dispatched to D.'s apartment in response to the alarm she activated. When they arrived, D. was inside her apartment. She was crying and in a great deal of pain. Her arms were covered with blood. Her pants and underwear were on the floor beside her. No one else was in the apartment.

When the officers looked around D.'s apartment, they found two articles of clothing and a plastic water bottle by the front door. There was a clear broken glass stem on top of the table and red and clear pieces of glass as well as a broken red glass cup on the floor. The front window was broken and there was blood in the entryway. A blood trail led out the front door, down the sidewalk, and to the east of the apartment complex.

Officers Stephen Singh and Ascencion Felix went outside to search for suspects. They spotted Hernandez walking south, away from the apartment complex's south gate. Both officers yelled, "Police, stop." Hernandez kept walking. They yelled a couple more times, "Police, stop," but Hernandez ignored them. Hernandez tried to open the gate to the apartments. When Hernandez discovered the gate was locked, Hernandez continued to walk away from the officers. Hernandez made a motion with his hand and tossed a broken clear vase and stem, and a red glass cup, over a fence near the apartments. Singh ran up to Hernandez, grabbed his right arm, ordered him to stop, and pulled him to the ground. Singh kept ordering Hernandez to show the officers his hands. Hernandez tucked his hands into his chest. Singh pulled Hernandez's hands behind his back and placed him in handcuffs.

There was blood on Hernandez's face, around his wrists, and on his jeans. Singh asked Hernandez why he was walking away from the apartment complex. Hernandez did not respond. Singh asked Hernandez why he had blood on him. Hernandez said he was jumped on the east side. Hernandez stated he did not need medical attention. Singh asked Hernandez who jumped him, and Hernandez answered that "West Siders" did. Hernandez attempted to explain where he was jumped, but after Singh told him the location did not make sense, he provided a different location.

Officer Cory Gustafson went to Hernandez's location and attempted to place evidence bags on Hernandez's hands. Hernandez opened and closed his hands, causing the bags to fall off. Eventually, Gustafson was able to secure the bags to Hernandez's hands with medical tape.

Paramedics arrived at D.'s apartment to transport D. to the hospital. On the way, she was taken to the location where Hernandez had been detained. A standard admonishment was read to her. When police shined their spotlight on Hernandez, D. said, "Yes, that's him." However, D. was subsequently unable to identify Hernandez in a live lineup, but did identify him in court at trial.

D. was taken to the hospital for a sexual assault examination. When she arrived, she had bloodstains on her bra and shirt. There were multiple bruises on her arms and legs. She had abrasions and bruising below her left breast, on her left cheekbone, and on her lower lip. Some of her teeth were loose.

A genital examination revealed multiple abrasions and tenderness to the inguinal fold. There were large purple bruises on her genital and anal areas. Her labia, urethra, and cervix were bruised and bleeding. D. had a severe laceration in her vaginal and perineum area, which required sutures.

A sexual assault exam also was performed on Hernandez. There were injuries on his right hand. The nurse swabbed Hernandez's hands, genital areas, and mouth for DNA.

Detectives Aaron Messick and Dorian Meneses interviewed Hernandez at the police station around 7:00 a.m. on January 12, 2013. Hernandez waived his *Miranda* rights and agreed to make a statement. Hernandez told the detectives that he went to a bar called the Rat Cellar, then to another bar called the Tavern, where he met up with a friend. He decided to go to his friend's house. He was walking southbound on Fifth Street when some men showed up and followed him. They got into a fight. Hernandez jumped over a few fences, ended up on Hamilton, and was stopped by the police.

Messick asked Hernandez for the friend's name, but Hernandez refused to provide it. Messick asked Hernandez if the men following him had hit him. Hernandez said they hit him in the head. Hernandez added that there were three men. He would not tell Messick who they were because it would not be "in [his] best interests." However, Hernandez stated that they hit him with a piece of metal or a stick, he ran away, they chased after him, and he was stopped by the police.

Messick told Hernandez that one of the arresting officers saw him throw something red as he ran, and asked Hernandez what he threw. Hernandez denied throwing anything. Asked if he hid in someone's house, Hernandez said no, he just ran. He ran through a house but was not holding a red object. He jumped over a few fences and crossed through some apartments. When he exited, he was placed under arrest.

Messick urged Hernandez to tell the truth, and asked him why he broke into D.'s apartment. Hernandez told Messick he did not break into an apartment, he passed by the apartment and went over the fence. Asked, "Why did you do it?," Hernandez responded, "Why did I do what? The truth is I owed some money." When Messick asked Hernandez who he owed money to, Hernandez said, "T[w]o dudes from West Side." Hernandez refused to give Messick the names of the "dudes." Messick asked Hernandez, "Is that why you broke into the apartment?" Hernandez responded, "What apartment?" Hernandez claimed he ran through a couple of apartments but did not have time to break into them.

Hernandez then told Messick he went into an apartment, but he was "pretty wasted." A friend of Hernandez's broke the window and entered first. Hernandez heard screaming, so he followed. D. was on the floor. Hernandez grabbed an object to hit his friend, then changed his mind and ran out. An alarm went off and his friend left.

Messick asked Hernandez what happened while he was in the apartment. Hernandez told Messick that he saw D. on the floor. Hernandez's friend was "all over her." Hernandez picked up an object so he could hit the friend. He decided against it, left, and was stopped by the police. Asked how he broke the window, Hernandez insisted he did not, saying the door was open and he went inside. Messick asked Hernandez how he got blood on his sweatshirt. Hernandez said he did not know. Asked again, Hernandez said the blood was from his fight with West Side gang members.

Before the fight, Hernandez's friend said, "Let's make some money." The friend broke D.'s window. Hernandez waited outside as a lookout. He heard screaming, went in, and prepared to hit the friend. He did not and instead ran out. He did not hurt D. and the blood was not hers. He had no idea where it came from.

Messick asked Hernandez how long he and his friend had known each other. Hernandez said they had been acquaintances for a while, then claimed people would come after him if he provided police with the friend's name. Hernandez added that the friend lived on Hamilton, a couple of houses down from D. Asked what the friend looked like, Hernandez responded that he was "skinny, a tweaker." Messick told Hernandez he needed a name or a street name. Hernandez refused, saying he did not want to be killed in jail or on the street. Finally, Hernandez said his friend's nickname was "Chino" and he was 24 years old.

Messick again asked Hernandez, "Why did you do it?" He responded that he needed money. He then elaborated that Chino broke D.'s window and went in. Hernandez paced back and forth outside. He heard screams and walked inside. D. was on the floor. Chino was leaning over her. Hernandez grabbed an object

to hit Chino, decided not to, and walked out. Hernandez stated that no one was supposed to be home and denied raping D.

After the interview, Meneses went to the address on Hamilton where Hernandez said Chino lived. A woman named Yesenia Orozco was outside. Orozco told Meneses that Chino was her son, Gabriel Ortiz. She added that he was not living at the residence and had not been there for about a month. Instead, Ortiz had been staying with his aunt in El Monte at the time the crimes were committed.

Elias Valencia, a criminalist with the Department of Justice laboratory in Riverside, examined items of evidence collected in this case. Valencia explained that he followed the procedures outlined in the lab's technical manual, including precautions to prevent contamination.

Valencia selected items for DNA analysis. From D.'s sexual assault exam kit, he selected a saliva reference sample, fingernail scrapings, samples from her left and right breasts, and samples from her neck. From Hernandez's sexual assault exam kit, he selected samples from his left second and fourth fingers, saliva reference samples, and fingernail scrapings.

Valencia looked at the bags used on Hernandez's right hand. The interior bag was torn and the exterior bag was sealed. Stains on the interior bag tested positive for blood. There also was blood on the interior bag used on Hernandez's left hand. Valencia cut out some samples from the bag and stored them.

Valencia examined the plastic water bottle collected from D.'s apartment. It had no lid and was empty. Valencia saw white residue and a possible hair near the lid. He collected the hair, swabbed the residue, and packaged the hair and swab for DNA analysis.

Valencia noted several stains on Hernandez's sweatshirts with most of the stains on the cuffs. The stains tested positive for blood. Valencia collected a stained piece of toilet paper, which was in the right front pocket of the sweatshirt. He also collected hairs he found near the bottom of the hem.

7

Valencia examined the broken candle holder found in D.'s apartment. There were blood stains on the stem and on the base. The items tested negative for feces.

Marla Richardson, another analyst with the Riverside laboratory, conducted the DNA testing on evidence collected by Valencia. Richardson stated that she followed the proper protocol to prevent contamination of the evidence.

Richardson determined that the candle cup holder contained a mixture of DNA from two or more persons. D. was the major female donor. There was a minor trace from an unknown male. Because Richardson did not have enough DNA for comparison, she sent the sample to the Department of Justice laboratory in Richmond for further testing.

Hernandez was the minor donor from the fingernail scrapings on his left hand, while D. was the major donor. There was a substantial amount of DNA, which was unusual. D. and Hernandez were equal donors to DNA taken from Hernandez's right hand fingernail scrapings.

The swab from the bottom of the water bottle contained DNA from at least two people. D. was the major female donor. There was very little DNA from the second person. The red brown stains on the water bottle were consistent with a single source, D. Hernandez was excluded as a donor.

Hernandez was the major donor to the bloodstain from the interior brown paper bag placed on his hand. There was not enough information to determine the minor donor.

Richardson ran control samples, her work was reviewed, and there was no indication of contamination. However, when she analyzed D.'s control sample, she detected a trace amount of male DNA, which indicated it had been contaminated. As such, Richardson sent the sample to the laboratory in Richmond for further analysis.

Meghan Gray, a senior criminalist with the Department of Justice laboratory in Richmond, performed more sophisticated testing on D.'s reference sample. She tested it against DNA from

Riverside laboratory employees, Hernandez, Gabriel Ortiz, and the emergency room physician who treated D. It did not match any of these individuals.

Defense

Hernandez testified at trial in his defense. He stated that on the evening of the crimes, he had been out drinking with some friends. He met up with a friend named Alan Fuentes. They walked to Circle K to buy some beer, then proceeded to Fuentes's house across the street. It was about 3:00 a.m. As Hernandez and Fuentes were outside drinking beer, three or four people showed up and a fight ensued. Hernandez ran away and cut through some apartments. Hernandez ended up on Hamilton and decided to see if Gabriel Ortiz was awake. He had known Ortiz about two years. Ortiz was outside smoking a cigarette and acting strange. Ortiz mentioned the possibility of breaking into an empty house. Hernandez agreed to accompany Ortiz.

While Ortiz went inside D.'s apartment complex, Hernandez stood across the street acting as a lookout. Hernandez heard glass shatter and then about a minute or so later he heard an alarm go off. He walked toward the apartments and as he came closer he saw an apartment door semiopened. Hernandez pushed the door open with his foot and saw Ortiz standing over a woman. The woman was on her stomach and Hernandez could see her bare legs. The woman was crying and screaming. Hernandez grabbed an object off a table as he came into the apartment because he saw what was happening and his first instinct was to hit Ortiz. He did not see Ortiz do anything to the woman. He was inside her apartment maybe 25 to 30 seconds. Wanting no trouble, Hernandez ran. Realizing his fingerprints were on the object he grabbed, he took the object with him.

Ortiz came outside. Hernandez was mad because he thought no one was going to be at home and swung at Ortiz. Ortiz grabbed his arms. Hernandez heard police cars coming and left walking northbound out of the apartment complex through the front gate. He did not know where Ortiz went. He threw the candle holder inside of a fence.

After his arrest, he eventually admitted being involved in the burglary. Hernandez testified that he received a cut on his ear from his son. He believed the marks underneath his nose were from the fight he had been in earlier that night and that he got blood on his clothes when Ortiz grabbed him. He did not identify Ortiz right away because he did not want to be seen as a snitch. He denied assaulting D. and did not know Ortiz was going to attack her. He did not think anyone was inside the apartment. He was only interested in taking property from the apartment.

Suzanna Ryan, a private forensic DNA consultant, noted that D.'s reference sample was contaminated. She testified that although it is possible the source of the contamination was the gauze pad used to take the sample, the more likely source was the Riverside laboratory.

According to Ryan, the Department of Justice forensic manual recommends extracting evidence from a victim and suspect at different times or places. This guideline was not followed in the instant matter, in that the paper bags over Hernandez's hands were processed at the same time as the water bottle, and the cuff of his sweatshirt was processed during the same sequence as the red brown stain from the label on the water bottle. Ryan also testified that if a third party assaulted D., came into contact with Hernandez, and D.'s blood was transferred to Hernandez's sweatshirt, D.'s DNA might show up on a test even if Hernandez never touched her. Similarly, if that third party touched Hernandez's hands, D.'s DNA might appear under Hernandez's fingernails.

## II. State Court Trial

On October 21, 2014, a jury found Petitioner guilty of: (1) sexual battery by restraint (Count One); (2) two counts of sexual penetration by foreign object by force, fear or threats (Counts Two and Three); (3) assault with the intent to commit sexual penetration by foreign object by force, fear or threats (Count Four); and (4) first degree burglary (Count Five). See Lodgment 3-3 at 8-18; Lodgment 7 at 2.

The jury also found true the following special allegations: (1) that in the commission of the crimes alleged in Counts Two and Three, Petitioner personally inflicted great bodily

10

injury on the victim; (2) that Petitioner committed the crimes alleged in Counts Two, Three and Four during the commission of first degree burglary; and (3) that during the commission of the burglary charged in Count Five, there was a person present who was not Petitioner's accomplice. See Lodgment 3-3 at 8-18; Lodgment 7 at 2.

Petitioner was sentenced to sixty years to life in state prison. See Lodgment 3-3 at 107-110; Lodgment 7 at 2.

## III. Appeal to the California Court of Appeal

On January 8, 2015, Petitioner appealed his conviction to the California Court of Appeal, arguing: (1) ineffective assistance of trial counsel; (2) insufficient evidence to support a great bodily injury enhancement on Count Two; (3) that Petitioner's conviction for first-degree burglary should be reversed; (4) that Petitioner's burglary sentence be stricken; (5) a violation of due process in the trial court's instruction to the jury on assault with intent to commit penetration with a foreign object; (6) that Petitioner's conviction for Count One should be deemed to run concurrently; (7) that Petitioner's abstract of judgment required correction; and (8) that the Court of Appeals conduct an independent review of the trial court's *in camera* review of materials pursuant to Petitioner's request for a new trial. See Lodgment 4 at 24-60.

On March 4, 2016, the Court of Appeals reversed the jury's verdict on Counts Four and Five and the jury's finding of great bodily injury in connection with Count Two, but otherwise affirmed the judgment of conviction in all other aspects. See Lodgment 7 at 38.

## IV. Petition for Review to California Supreme Court

On April 6, 2016, Petitioner filed a petition for review of the California Court of Appeal's decision in the California Supreme Court. Lodgment 8. Petitioner presented the same ineffective assistance of counsel ground previously presented in Petitioner's appeal to the California Court of Appeal. See id. On May 24, 2016, the Supreme Court of California denied Petitioner's petition for review. Lodgment 9.

///

///

## V.  **Federal Habeas Petition**

On September 28, 2016, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court. See Pet. On October 7, 2016, the Court dismissed the action without prejudice, holding that Petitioner had failed to name a proper respondent in his original Petition.  ECF No. 5 at 2-3. On October 31, 2016, Petitioner filed an Amended Petition. See FAP.

On January 4, 2017, Respondent filed an Answer. ECF No. 15. The Court subsequently granted several of Petitioner's requests to extend the time to file a traverse. See ECF Nos. 31, 46, 50, 55, 57, 64, and 67. Despite numerous extensions, Petitioner did not file a traverse. See Docket. The Court thereafter took the matter under submission.

## SCOPE OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

Petitioner's FAP was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Accordingly, the AEDPA applies to the FAP.

Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In making this determination, a court may consider a lower court's analysis. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (authorizing a reviewing court to look through to the last reasoned state court decision). Summary denials are presumed to constitute adjudications on the merits unless "there is reason to think some other explanation for the state court's decision is more likely." Harrington v. Richter, 562 U.S. 86, 98-101 (2011).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413). "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Id. at 75-76 (citations and internal quotation marks omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

If the state court provided no explanation of its reasoning, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state

13

court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." <u>Harrington</u>, 562 U.S. at 102. In other words, a federal court may not grant habeas relief if any fair-minded jurist could find the state court's ruling consistent with relevant Supreme Court precedent. <u>Id.</u>

Habeas relief is also available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); <u>Wood v. Allen</u>, 558 U.S. 290, 293 (2010). A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were "objectively unreasonable in light of the evidence presented in state-court proceeding[.]" <u>See</u> <u>Miller-El</u>, 537 U.S. at 340. This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. <u>See</u> 28 U.S.C. § 2254(e)(1); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473-474 (2007).

## **ANALYSIS**

Petitioner presents a single ground for federal habeas relief consisting of four subclaims: (1) denial of due process; (2) denial of the right to a fair trial; (3) denial of the right to present a complete defense of third-party culpability; and (4) ineffective assistance of counsel.

Specifically, Petitioner asserts:

> Petitioner was denied due process, a fair trial, and the right to present a complete defense of third party culpability, and the effective assistance of counsel when, without a request for a competency hearing, the trial court allowed the very witness petitioner accused of committing the offenses to testify in front of the jury and then struck his testimony after finding the witness incompetent to testify.

FAP at 10.

Respondent argues that: (1) Petitioner's mere reference to the Due Process clause and a right to a fair trial "is insufficient to render claims viable under the Fourteenth Amendment"; (2) Petitioner's ineffective assistance of counsel claim must fail as Petitioner has failed to show deficient performance or prejudice; and (3) Petitioner's right to present a complete defense claim must fail "because he has no right to introduce incompetent evidence[.]" ECF No. 15-1 at 16-28.

## I.   Ineffective Assistance of Counsel

Petitioner alleges his trial counsel was constitutionally ineffective by failing to request that the trial court hold a competency hearing for Gabriel Ortiz prior to having Mr. Ortiz testify at trial. See FAP at 16-26.

Respondent counters that: (1) the California Court of Appeal concluded correctly that Petitioner's trial counsel made a tactical decision not to have Mr. Ortiz testify and (2) Petitioner failed to show any prejudicial effect. ECF No. 15-1 at 23-28.

Petitioner presented this claim to the California Supreme Court in a Petition for Review. Lodgment 8. On May 18, 2016, the California Supreme Court summarily denied the petition without a statement of reasoning or citation of authority. Lodgment 9. The Court therefore "looks through" this silent denial to the California Court of Appeal's opinion. See Ylst, 501 U.S. at 804 n.3.

The California Court of Appeal considered Petitioner's ineffective assistance of trial counsel claim and denied it as follows:

> Here, Hernandez contends that his trial counsel was prejudicially ineffective because he failed to request a competency hearing prior to Ortiz appearing as a witness at trial. He notes that his primary defense was that Ortiz assaulted D. and Ortiz's appearance and testimony at trial eviscerated his defense.
>
> To show that trial counsel's performance was constitutionally defective, an appellant must prove: (1) counsel's performance fell below the standard of reasonableness, and (2) the "deficient performance prejudiced the defense." (*Strickland v. Washington*

15

(1984) 466 U.S. 668, 687-688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (*Strickland*).) Competency is presumed unless the record affirmatively excludes a rational basis for trial counsel's choice. (*People v. Ray* (1996) 13 Cal.4th 313, 349, 52 Cal. Rptr. 2d 296, 914 P.2d 846; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, 74 Cal. Rptr. 2d 212, 954 P.2d 475.) We reverse on the ground of inadequate assistance on appeal only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437, 48 Cal. Rptr. 2d 525, 907 P.2d 373 (*Lucas*); see *Ray, supra*, at p. 349.)

Hernandez's claim of ineffective counsel arises from his trial counsel's failure to request a competency hearing as to Ortiz. However, we generally defer to the tactical decisions of trial counsel. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1212, 65 Cal. Rptr. 2d 240, 939 P.2d 354; *People v. Holt* (1997) 15 Cal.4th 619, 703, 63 Cal. Rptr. 2d 782, 937 P.2d 213.) "[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" (*Lucas, supra*, 12 Cal.4th at p. 437, quoting *Strickland, supra*, 466 U.S. at p. 689.)

Hernandez insists that it was "inexplicable" that his trial counsel did not request the court to make a preliminary finding of Ortiz's competency, and as such, his trial counsel's representation of Hernandez fell below the appropriate standard of reasonableness. To this end, Hernandez points out that his trial counsel should have been on notice for the need of a competency hearing. For example, at trial, Meneses testified that, in her experience talking to Ortiz, Ortiz would struggle to answer simple questions. Ortiz's mother testified that Ortiz had some sort of disability. In addition, Hernandez notes that, prior to Ortiz being called as a witness at trial, the court examined him outside the presence of the jury, and "it was rather patently clear Ortiz was a problem witness." Indeed, in the middle of the court's discussion with Ortiz, the prosecutor commented that she had "grave doubt" about Ortiz's competency.

Against the background, Hernandez essentially argues that his trial counsel had to realize that a competency hearing was necessary, especially considering that Hernandez's primary

defense theory was that Ortiz actually attacked the victim. We are not persuaded. Although we agree with Hernandez that his trial strategy was to argue that Ortiz assaulted D., we cannot say with any kind of certainty that Hernandez's trial attorney had no strategic reason for having Ortiz testify without first moving for a competency hearing. Indeed, until Ortiz actually did testify, the record supports the inference that Hernandez's trial attorney wanted Ortiz to testify at trial.

Hernandez's trial attorney objected to Meneses's testimony to the extent she was offering an opinion as to Ortiz's cognitive ability. Further, in cross-examining Meneses, Hernandez's trial attorney tried to frame Ortiz's inconsistent answers to Meneses's questions as evidence that Ortiz was lying to the detective, and as such, Meneses's investigation of the subject crimes was lackluster because she did not more aggressively pursue Ortiz as a suspect. Also, after the court questioned Ortiz outside the presence of the jury, asking him if he had been subpoenaed and whether he would like counsel appointed, and the prosecutor expressed her doubts that Ortiz could understand what was going on, Hernandez's trial counsel pushed for the court to appoint Ortiz counsel. Further, defense counsel emphasized that he anticipated that there would be a "lengthy examination" of Ortiz "based upon his behavior before the Court just now." Hernandez's trial counsel even expressed doubt regarding how productive any examination of Ortiz would prove: "And I don't know how much information we're really going to get out of him at this point in time." The court agreed, but stated that it did not know how an appointed attorney would help the attorneys elicit more information from Ortiz when he testified. Hernandez's trial attorney countered by arguing that if Ortiz had an attorney, that attorney would "probably advise him that he has this right and he should exercise it. That would probably be my advice to him if I was representing him based upon representations that were made with the Court right now. So for that reason, that's why I'm asking for the appointment." In other words, Hernandez's trial attorney wanted the court to appoint counsel for Ortiz so that counsel would advise Ortiz to take the Fifth Amendment and refuse to testify at trial. Defense counsel appears to have made the tactical decision to have Ortiz appear as a witness at trial only to take the Fifth Amendment. Ortiz could not do so if the

17

court found him to be incompetent prior to trial. Accordingly, the record supports at least a plausible strategic reason for defense counsel not to challenge Ortiz's competency.

Only after Ortiz proved to be a difficult witness for both the prosecution and the defense at trial did Hernandez's trial counsel state that he did not believe Ortiz should have taken the stand in the first place. Based on the cold record before us, defense counsel's comments are made with the benefit of hindsight. This is not sufficient to render implausible the possibility that Hernandez's trial counsel made the strategic decision that Ortiz should be called as a witness at trial.

Further, even we were to assume that Hernandez's trial counsel's representation of Hernandez fell below the applicable reasonable standard, we conclude that Hernandez has not shown that he was prejudiced by his counsel's actions. (See _Strickland, supra_, 466 U.S. at pp. 687-688.) After the court determined that Ortiz was incapable of testifying, it advised jurors that they could not consider his testimony for any purpose. We presume jurors followed the instruction and did not base their decision on the stricken testimony. (_People v. Hovarter_ (2008) 44 Cal.4th 983, 1005, 81 Cal. Rptr. 3d 299, 189 P.3d 300.)

Moreover, although the court allowed jurors to consider Ortiz's demeanor while he was testifying, they heard other testimony that Ortiz struggled to answer simple questions. For example, Meneses testified that when she spoke to Ortiz on September 15, 2014, Ortiz gave various statements and conflicting responses. Meneses explained:

"Probably the easiest way to illustrate this is to provide an example of his — the way he answers would be, say, simple question would be if he is wearing a black shirt, within that same answer he could say, yes, yes, no, yes, no, and you can see just — I can see, not you, I can see that he is having problems with his thought process in answering just that simple question. It's like that with him whenever you ask him any other questions. Again, I have seen this throughout my interactions with Mr. Ortiz in the past as well. That's what I

meant by cognitive issues. It's something you can't really fake."

Additionally, during closing argument, defense counsel commented about Ortiz's demeanor at trial. He told jurors that if Hernandez were responsible for the sexual assault, he would have taken the water bottle with him and disposed of it. Hernandez's demeanor on the stand, counsel argued, showed he was a rational and intelligent person; and disposal of the evidence is what a rational person would do. Ortiz, however, would not think this way, "because he seemed to be a fairly irrational person by most people's standards." Hernandez's trial counsel also reminded jurors that Ortiz's behavior "was strange and bizarre by any standards." He told the jury that Ortiz was "putting on an act" to get out of court, was under the influence of drugs, or was mentally ill. In any case, defense counsel argued that Ortiz's behavior was suspect. Hernandez's trial counsel suggested to the jury, "Would you feel safe sitting next to Gabriel Ortiz? I sure wouldn't."

In addition, the evidence of Hernandez's guilt was mountainous. When D. saw Hernandez at a curbside line up, she immediately yelled, "That's him." D. said she was 100 percent sure Hernandez was the person who attacked her. D. also identified Hernandez in court. The police saw Hernandez near D.'s apartment shortly after the crimes were committed. Hernandez matched the description D. had given of her assailant.

When the police saw Hernandez near D.'s apartment complex, they ordered Hernandez to stop, but he kept walking. He had blood on his face, around his wrists, and on his clothes. Hernandez refused to tell the officers what he was doing in the area. Asked why he was bloody, Hernandez claimed some gang members jumped him near two intersecting streets that were actually parallel to each other. When the inconsistency was pointed out to Hernandez, he named a different location. Hernandez attempted to prevent officers from bagging his hands for evidence. Before Hernandez was detained, he tossed the candle holder he used in the assault over a fence. Hernandez had injuries to his hands and face consistent with a struggle with the victim. D.'s DNA was found on fingernail

scrapings taken from Hernandez's hands and from blood found on Hernandez's sweatshirt. In talking to the police, Hernandez changed his story about what he was doing on the night in question. It was not until the end of the interview that he even mentioned that Chino (Ortiz) had attacked D. At trial, Hernandez offered yet additional detail about what occurred on the night in question providing another version of events.

In comparison, other than Hernandez's suggestion that Ortiz assaulted D., there is no indication in the record that Ortiz was involved in the subject crimes. D. gave a statement to the police and testified at trial, and never wavered from her account that only one person - Hernandez - was in her apartment that night. Ortiz's DNA was not on any of the items of the evidence or on the victim, and he was not at the scene that night. And, Ortiz's mother told police, and repeated at trial, that Ortiz was in Los Angeles County at the time the crimes were committed.
In summary, there was no prejudice to Hernandez and his ineffective assistance of counsel claim therefore must fail. (*People v. Gray* (2005) 37 Cal.4th 168, 209.)

Lodgment 7 at 14-26.

      **a.**    **Analysis**

"The right to counsel is the right to the effective assistance of counsel." <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984) (citations omitted). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Id.</u>

To prove ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was deficient; and (2) that this deficient performance prejudiced the defense. <u>Id.</u> at 687. The proper measure of attorney performance is "simply reasonableness under prevailing professional norms." <u>Id.</u> at 688.

In assessing the reasonableness of counsel's performance, the Court "must be highly deferential, avoid the distorting effects of hindsight, and indulge a strong presumption that [counsel's] conduct falls within the wide range of reasonable professional assistance."

Williams v. Woodford, 384 F.3d 567, 610 (9th Cir. 2002), cert. denied, 546 U.S. 934 (2005) (quoting Strickland, 466 U.S. at 689). Courts judge the reasonableness of an attorney's conduct "on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690. The Court may "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight[.]" Karis v. Calderon, 283 F.3d 1117, 1130 (9th Cir. 2002), cert. denied, 539 U.S. 958 (citation and quotations omitted); see Yarborough v. Gentry, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight") (citations omitted).

To determine whether errors of counsel prejudiced the defense, a court "must consider the totality of the evidence before the judge or jury" and consider whether "the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." Strickland, 466 U.S. at 696. The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. Id. at 697.

An AEDPA review of claims alleging ineffective assistance of counsel must be "doubly deferential in order to afford both the state court and the defense attorney the benefit of the doubt." Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (citations and quotations omitted). Under this standard of review, the Court finds the California Court of Appeal's denial of Petitioner's claim was not contrary to or an unreasonable application of clearly established law, nor was it based on an unreasonable determination of fact.

Here, the Court of Appeal's conclusion that "until Ortiz actually did testify, the record supports the inference that [Petitioner]'s trial attorney wanted Ortiz to testify at trial" is well supported by the record. Lodgment 7 at 21. It is reasonable to conclude Petitioner's trial counsel considered the effect that Mr. Ortiz's cognitive state would have on the defense's case and deliberately chose not to request a competency hearing in an attempt to elicit potentially exculpatory statements from Mr. Ortiz on the stand. See Delao v. Kirkland, 2009 U.S. Dist. LEXIS 23053, at *47 (C.D. Cal. Jan. 6, 2009) (counsel did not

21

provide ineffective assistance where record showed counsel considered effect of witness' mental state on defense case and made a reasoned decision not to ask court to disqualify the witness); Conerly v. Lewis, 2006 U.S. Dist. LEXIS 59794, at *40 (E.D. Cal. Aug. 14, 2006) (defense counsel's failure to request competency hearing not ineffective assistance where witness testimony was helpful to defense).

In fact, Petitioner's trial counsel did not argue Mr. Ortiz should not have testified until after the trial court already declared Mr. Ortiz incompetent. Lodgment 1-17 at 95-96. This only occurred after Petitioner's trial counsel had had the opportunity to cross-examine Mr. Ortiz and became unable to elicit any responses from him. Id. at 79-94. Prior to this, Petitioner's trial counsel represented to the trial court that he actually felt "incumbent upon" to ask Mr. Ortiz a "number of questions" and that he anticipated a "lengthy examination." Id. at 87.

Petitioner argues the Court of Appeals erred by concluding his trial counsel made a "tactical decision to have Ortiz appear as a witness at trial only to take the Fifth Amendment." FAP at 18-20. In support, Petitioner cites to California Evidence Code § 913 and the Supreme Court of California's decision in People v. Mincey, 2 Cal. 4th 408 (1992) in support. Id.

Evidence Code § 913, subdivision (a) provides that "no presumption shall arise" from a witness's exercise of the privilege self-incrimination, and the "trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding." Subdivision (b) provides that "at the request of a party who may be adversely affected," the Court shall instruct the jury to draw no inferences from a witness's invocation of the Fifth Amendment as to the witness's credibility or any other matter at issue in the proceeding.

In People v. Mincey, the California Supreme Court upheld a trial court's decision denying a defendant's request to force a witness to invoke the Fifth Amendment privilege in front of a jury. 2 Cal. 4th at 440-42. The California Supreme Court held that pursuant to Evidence Code 913(b), even "[i]f the trial court . . . had permitted defendant to compel [the

witness] to assert the privilege in front of the jury, it would have been required, on request, to instruct the jury not to draw the very inference defendant sought to present to the jury." Id. at 442.

Although Petitioner labels this argument as a federal ineffective assistance of counsel claim, it appears Petitioner is asking this Court to find that the California Court of Appeals erred in applying California evidentiary rules. Federal habeas relief may not be based on alleged violations of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (citations omitted); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) (A federal habeas court does not review "questions of state evidence law.").

Even assuming that Petitioner alleged a valid federal issue, as already noted above, compelling Mr. Ortiz to take the Fifth Amendment in front of the jury is not the only plausible explanation for why Petitioner's trial counsel would choose not to request a competency hearing. As the California Court of Appeals concluded, it was "[o]nly after Ortiz proved to be a difficult witness" that trial counsel "state[d] that he did not believe Ortiz should have taken the stand in the first place." Lodgment 7 at 23. Prior to this, the record shows Petitioner's trial counsel anticipated a lengthy examination of Mr. Ortiz to elicit statements that would be beneficial to the defense. See Lodgment 1-17 at 87. With the benefit of hindsight, this strategy may not have been effective. However, as the Court of Appeals correctly held, determinations made in hindsight are "not sufficient to render implausible the possibility that [Petitioner's] trial counsel made the strategic decision that Ortiz should be called as a witness at trial." Lodgment 7 at 23; see Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984) (reasoned tactical decisions are not ineffective merely because in retrospect better tactics may have been available).

Finally, even if counsel's performance had been deficient, the Court nevertheless concurs with the Court of Appeals that Petitioner has not shown prejudice. Here, after

finding Mr. Ortiz incompetent, the trial court not only struck Mr. Ortiz's testimony from the record, but also provided an instruction to the jury it was not to consider Mr. Ortiz's testimony for any purpose. Lodgment 1-17 at 98-99. These steps were appropriate methods to overcome any potential prejudice suffered by Petitioner from Mr. Ortiz's testimony. A jury is presumed to follow a trial court's instructions, and this Court sees no basis to find that the jury did not do so in Petitioner's case. See Weeks v. Angelone, 528 U.S. 225, 234 (2000); Richardson v. Marsh, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions").

Although the state trial court allowed the jurors to consider Mr. Ortiz's demeanor on the stand, Petitioner has also not shown how this was prejudicial to his defense. As the Court of Appeals correctly opined, the jurors heard testimony from other sources regarding Mr. Ortiz's inability to answer simple questions. Lodgment 7 at 23-24. See e.g., Lodgment 13 at 117-18, 121-23; 126-28.

Moreover, there is nothing to suggest Mr. Ortiz's demeanor was not actually helpful to the defense. Indeed, Petitioner's trial counsel explicitly referenced Mr. Ortiz's demeanor during closing, noting Mr. Ortiz's behavior on the stand was "strange and bizarre by any standards" and specifically asking the jury if they would "feel safe sitting next to Gabriel Ortiz?" Lodgment 1-19 at 1483. During closing, Petitioner's counsel also referenced Mr. Ortiz's demeanor when arguing that the perpetrator of the crime had to have been irrational given the evidence that been left at the scene—attempting to infer that the perpetrator was not Petitioner, but Mr. Ortiz. Id. at 1465-66. Accordingly, it was not unreasonable for the Court of Appeals to conclude Petitioner's defense was not prejudiced.

For these reasons, the Court **RECOMMENDS** that Petitioner's subclaim alleging ineffective assistance of counsel be **DENIED.**

///
///
///
///

## II.  **Due Process, Right to a Fair Trial, Right to Present a Complete Defense**

Petitioner asserts he was also denied "due process[,]" a "fair trial[,]" and the "right to present a complete defense of third party culpability" when the "trial court allowed the very witness petitioner accused of committing the offenses to testify in front of the jury and then struck his testimony after finding the witness incompetent to testify."  FAP at 10.

### a.  **Exhaustion**

While the Court is under no obligation to review the record to determine compliance with the AEDPA's requirements, it may consider *sua sponte*, threshold issues such as exhaustion. See Day v. McDonough, 547 U.S. 198, 205-06 (2006). Here, the Court finds Petitioner did not properly develop his "due process," "right to a fair trial" or "right to present a complete defense" subclaims in state court.

Generally, a federal court may not consider a petition for habeas corpus unless the petitioner has first presented his claims to the state courts, thereby "exhausting" them. 28 U.S.C.A. §2254(b)(1)(A); Rose v. Lundy, 455 U.S. 509, 522, (1982). "[E]xhaustion of state remedies requires that petitioners fairly present federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]" Duncan v. Henry, 513 U.S. 364, 365 (per curiam) (citations and internal quotation marks omitted).

To satisfy the exhaustion requirement, the Petitioner must demonstrate that: (1) "he has 'fairly presented' his federal claim to the highest state court with jurisdiction to consider it"; or (2) "that no state remedy remains available." Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996) (citations omitted). Claims are not exhausted by mere presentation to the state appellate system. A petitioner must also "alert[] [the state] court to the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A "conclusory, scattershot citation of federal constitutional provisions, divorced from any articulated federal legal theory" fails to satisfy the fair present requirement. Castillo v. McFadden, 399 F.3d 993, 1002-03 (9th Cir. 2004) ("Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal

theory."). See <u>Hiivala v. Wood</u>, 195 F.3d 1098, 1106 (9th Cir. 1999) ("[G]eneral appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion.").

Here, Petitioner's briefs to the California Court of Appeals and Supreme Court of California reference a due process and right to fair trial theory only briefly in a section heading. Lodgment 4 at 24; Lodgment 8 at 3. Petitioner's briefs fail to cite to any authorities underlying these theories or articulate why his right to due process or his right to a fair trial were violated. See Lodgment 4, Lodgment 8.

Similarly, Petitioner's brief to the California Court of Appeals contains only a passing reference to his "right to present a complete defense" in a section heading. Lodgment 4 at 24. Petitioner's brief to the Supreme Court of California is only somewhat more detailed, providing a conclusory argument in a section heading and then a generic statement under the "Standard of Review" that:

> Similarly, "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [106 S.Ct. 2142, 90 L.Ed.2d 636].) A defendant may present evidence in support of a relevant defense. ( *California v. Trombetta* (1984) 467 U.S. 479,485 [104 S.Ct. 2528, 81 L.Ed.2d 413]; *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [93 S.Ct. 1038, 35 L.Ed.2d 297].)

Lodgment 8 at 7, 10.[2]

---

[2] The <u>Crane v. Kentucky</u> case is directed to whether a state court erred in foreclosing a petitioner's efforts to introduce testimony about the environment in which police secured his confession. 476 U.S. at 690-91. The <u>California v. Trombetta</u> decision is directed as to whether law enforcement agencies are required to preserve breathalyzer samples. 467 U.S. at 491. The <u>Chambers v. Mississippi</u> case is directed to a defendant's right to confront and cross-examine witness and to call witnesses on the defendant's behalf. 410 U.S. 294-95.

The Court is not persuaded that such a vague appeal fairly presented Petitioner's federal constitutional issues to the state court. See Shumway v. Payne, 223 F.3d 982, 987 (9th Cir. 2000) (Petitioner's statement of the issues did not fairly present her federal claim to the state court—"[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court.") (citations omitted).

As any petition presented by Petitioner to the Supreme Court of California would now be submitted over four years after Petitioner's conviction and be likely time barred, the Court finds these subclaims are technically exhausted and procedurally defaulted in this Court. See Sissac v. Montgomery, 2018 U.S. Dist. LEXIS 115658, at *50-51 (S.D. Cal. July 11, 2018); Ramirez Guzman v. Madden, 2018 U.S. Dist. LEXIS 28021, at *22 (S.D. Cal. Feb. 21, 2018). The Court may still reach the merits of these claims if Petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Here however, the Court need not conduct a lengthy analysis to determine whether Petitioner could make a sufficient showing to excuse the default, because Petitioner's due process, right to a fair trial, and right to present a complete defense subclaims are insufficiently meritorious to provide for federal habeas relief for the reasons discussed below. See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (it is proper to proceed to merits where procedural bar issue is more complicated and result is the same).

///

///

None of these cases provide a clear indication of Petitioner's constitutional theory under the right to present a complete defense.

### b. Merits of Petitioner's Subclaims for Violation of Due Process, Right to a Fair Trial, and Right to Present a Complete Defense

As there is no reasoned state decision to look to, the Court conducts an independent review of the record to determine whether the trial court's decisions were objectively unreasonable. Based upon such a review, the court concludes that Petitioner is not entitled to habeas relief on the instant subclaims.

The issue of whether the state trial court erred by permitting a witness to testify without a competency hearing is a matter of state law that is not entitled to federal habeas relief. See Schlette v. California, 284 F.2d 827, 834-835 (9th Cir.1960) (competency of witness generally a matter of state law).

No "clearly established federal law" gives Petitioner a constitutional right imposing a duty on state trial judges to determine the competency of a prosecution witness in the absence of a challenge by the defense. See Delao, 2009 U.S. Dist. LEXIS 23053, at *59-60; Conerly, 2006 U.S. Dist. LEXIS 59794, at *40. Here, Petitioner's trial counsel raised no objection to Mr. Ortiz's competency to testify until after he had already been found incompetent, likely because Mr. Ortiz's testimony could have been helpful to the defense. Since no objection was raised, the trial court had no obligation to inquire further. See Conerly, 2006 U.S. Dist. LEXIS 59794, at *41.

Further, after finding Mr. Ortiz incompetent to testify, the state trial court took the appropriate steps of striking his testimony and instructing the jury not to consider Mr. Ortiz's testimony for any purpose. Lodgment 1-17 at 98-99. Petitioner has not shown how this violates his rights to due process, a fair trial, or to present a complete defense.

For these reasons, the Court **RECOMMENDS** that Petitioner's subclaims alleging a violation of his rights to due process, right to a fair trial, and right to present a complete defense be **DENIED.**

///
///
///

**CONCLUSION AND RECOMMENDATION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that no later than **April 19, 2019**, any party to this action may file written objections with this Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **May 10, 2019**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED**.

Dated: March 19, 2019

Honorable Linda Lopez
United States Magistrate Judge